The Chancellor..
The bill in this cause is filed for the partition of the real estate whereof John R. Speer died seized among his children and heirs-at-law. Speer died intestate, on the first of May, 1853, leaving three children, a son and two daughters, all of whom are parties to the suit. The bill is filed by one of the daughters, and charges that the father, in his lifetime, advanced to the son a part of his lands fully equal to the shares of the other children, and that he is therefore entitled to no part of the real estate descending from the father. The bill prays that the real estate of which the father died seized should be equally divided be *242 tween the two daughters. The son, by his answer, denies that he received any part of the real estate of the father by -way of gift or advancement, and claims to be entitled to an equal share with his sisters of the real estate of which the father died seized. This is the substance of the issue.
. It is not disputed that John R. Speer, the father, by two deeds of bargain and sale, the one dated on the sixth of .January, 1841, and the other on the twenty-sixth of April, 1847, for the aggregate consideration expressed in said deeds, .of $4500, conveyed to his son his homestead farm and two lots of land, containing together ninety-two and a half acres. It is satisfactorily established, by the evidence, that the value of the lands thus conveyed was between one-third and one half of the entire value of the real estate of the father.
-, The bill alleges, that no consideration whatever was paid for this land, but that it was conveyed by way of advance.ment. The answer alleges that the lands so conveyed by the said deeds were conveyed to the son, as a compensation for services which he had, before the dates of the respective conveyances, rendered to the father, and which were of the full value of the lands; and that it was distinctly agreed .that the said lands were not to be considered as an advancement, and were not to interfere with the share to which the defendant would be entitled as heir-at-law of his father.
It is proved that the father repeatedly declared that he had given the farm to his son, and that he intended to give ■his other lands to his daughters. He had given him his share of his estate, and that he had done for him what he intended to do. He had given him all he intended him to have, and he feared he could not do so well by the girls. He had more land than he could take care of, and he might as .well give some of it to his son now as to leave it till his death. He thought he had given him his share. These and similar expressions of the father, proved by numerous witnesses, show very clearly that he intended and understood the con■veyance as a gift of a portion of his estate to his son, in *243 anticipation of his death and the final distribution of his estate among his children.
There is evidence of the declarations of the son to the same effect. Dr. Charles T. Van Winkle testifies that Rynear told him that his father had given him a deed for the farm, with an understanding that he was not to put it upon record, or with an injunction to that effect. The witness understood him to say that he did not give anything for the farm. It was given to him — a bestowment or gift.
Albert M. Tichenor testifies, that in the fall of 1853, which was a few months after the death of John R. Speer, Wilson Kent, the husband of one of his daughters, having heard a report that Rynear intended to claim a portion of the estate, called upon him in company with the witness; told him that he had heard that he was going to claim another portion of the estate, and wanted to know if that was so. Rynear replied it was not so- — that he had never thought of it. This statement derives strong confirmation from the subsequent admission of the defendant himself, in a conversation with Simeon Brown shortly before filing the bill of complaint in this cause. Brown testifies that Rynear, having declared his intention to claim a share of the land of which his father died seized, the witness asked him if he did not tell Wilson Kent that he did not intend to claim any more land than he had. The defendant replied, “ I had a conversation with Kent about it;” and added, “ I told him I had not thought about it, or made up my mind whether I would claim my right or not.” In view of the inquiry that was made by Kent, and of the obvious motive for that inquiry, the version of the reply given by the defendant is as significant as that given by Tichenor himself. If he had received no advancement, why should he have doubted whether he would claim his rightful portion of his father’s estate ? The declarations, both of the father and son, indicate that the conveyance was made as a gift or advancement.
The admitted facts of the case are strongly corroborative of this view of the transaction. Independent of all parol *244 evidence in regard to the views or intentions of the parties, the facts, as disclosed by the defendant himself, strongly sup-j>ort the allegations of the bill. The answer admits that not a dollar was paid upon the delivery, but alleges that the services of the defendant, rendered previously to the dates of the deeds, constituted the entire consideration.
The son came of age on the twenty-ninth of April, 1838. He married on the tenth of the ensuing January, within nine months after he was of age. In the spring of 1839, he commenced housekeeping in the dwelling upon the old homestead, where he remained managing his father’s farm until the spring of 1845, when he removed to Little Falls, where he remained till about the time of his father’s death in 1853. The whole period that he had charge of the farm, after he came of age, was about seven years. He had a dwelling and entire support for himself and family during this period, living, it may fairly be presumed, in a style corresponding to that of his father and suitable to his condition in life. "What further compensation he received, if any, does not appear. As a remuneration for these services, he claims that his father deeded him nearly one half of his entire real estate, worth, as appears by the evidence, from about $4000 to $5000. As a matter of price, the remuneration was utterly disproportioned to the service, and inconsistent with the well known habits and feelings of our farming population.
This view of the case would seem to have occurred to the defendant himself, for he offered evidence to show that the father had promised the defendant's wife, who was living in the father's family before her marriage, that if she would remain with him he would do as well by her as the rest of his children; and having offered himself as a witness, he testified that the consideration for the deeds “was an agreement by my father to me and some money.” He states the agreement thus: “ In 1833, or just before that, my father came to me at school. He told me he meant that I should get a professional education, but he had altered his mind. He had a large farm, and nobody to take care of it. His business *245 called him away, and if I would come home, and take charge of it, he would give me a farm independent of the rest of his children. He thought that would be better for my health than to learn a trade or get a professional education.”
This was the alleged contract which formed the consideration of the deeds. He adds, that his father had money in his hands belonging to him, coming from his grandfather’s estate — how much he did not know.
The deeds were delivered to the defendant, as he testifies, by his father on the twenty-sixth of April, 1847, fourteen years after the alleged promise. The defendant further testifies it was agreed between his father and him, at the time of the delivery of the deeds, that it should be a settlement for the farm he agreed to give me if I would stay there until I was of age or was ready to do for myself; it was a settlement for my services with him and for what ho was indebted to me in general. This is a totally distinct case from that made by the answer, which makes no allusion whatever to any special contract — to any indebtedness from his father to him — either on account of his grandfather’s estate or on any account whatever, but alleges that the entire consideration for the conveyance was services rendered by the son for the father.
It is impossible to regard the transaction between the father and son, as detailed by the defendant, in the light of a legal contract to pay for services. If the evidence proves anything, it proves an intention on the part of the father to advance the son by giving him a farm. At the time of the alleged promise the defendant was a boy of sixteen. The deed was to be given as soon as he was of age. The father was in the meantime entitled to his services. They could constitute no consideration for the contract. To regard it in this light would bo to do violence, not only to the legal effect but to the whole spirit of the alleged conversation. It was perfectly natural that the father should, under the circumstances, prefer having his son at home, and as an inducement, should offer to advance him. He was an only son. His father deemed R *246 ■ most for the advantage of his son that he should abandon the idea of a profession. He desired his company and assistance. He proposed therefore, as soon as he was of age, to advance him by the gift of a farm. In this light it must necessarily have been viewed at that time, both by the father and the son. It was equally natural that the father, in pursuance of this proposal, should have eventually conveyed to the son the entire homestead farm of the grandfather, and that he should have given to him a larger portion of his estate than to either of his daughters; but there is nothing in the evidence, fairly considered, to justify the construction now put upon the transaction by the son, or to warrant the idea that the deed was delivered as a compensation for services rendered.
One of the deeds for about thirty-eight acres, part of the old homestead, is dated on the sixth of January, 1841, acknowledged on the seventeenth of March of the same year, but not recorded, and as the son swears, not delivered till 1847. This deed was executed within two years after the son’s marriage, and while he was residing upon the homestead. The second deed, for the residue of the homestead and the out lots, was not executed until the twenty-sixth of April, 1847, and both deeds, as the son informs us, were delivered upon the same day. This was two years after the son had left the farm, and while he was keeping a hotel at Little Falls. It was fourteen years after the alleged promise to convey the land, and nine years after the promise was to have been performed. The only reason assigned by the father for the great delay in giving the son a farm, as stated by the defendant, was, “he said he was’nt ready.” This was a very satisfactory reason for not making a gift, but a very absurd one for not paying a debt.
The only rational solution of the transaction furnished by the testimony is, that it was the execution of a long cherished purpose to advance the son in his lifetime, and that particular time was selected, as is testified by one of the witnesses, because he then contemplated a second marriage, and he desired to settle his son before that event.
*247 According to the evidence of the son, after the deeds were delivered they were demanded by the father, and actually given up by the son, and subsequently restored by the father. It is directly in evidence that the son declared that he was enjoined by the father not to put them on record, and that they wore not recorded until the son was advised that his title was thereby rendered insecure. The son never apprized the father, nor does it appear that the father ever knew that the deeds were recorded. The alleged obligation on the part of the father to pay for services rendered was never insisted upon by the son, nor, so far as appears, was it ever heard of by any other person in the lifetime of the father. All these circumstances are quite consistent with the idea that the deed was made to the son as an advancement. Many of them are quite irreconcilable, upon any rational theory, with the idea that the conveyances were made in execution of a contract and as compensation to the son for services. I am of opinion that the decided weight of the testimony upon the whole case is, that the deeds from the father to the son were made as a gift or advancement, and that, under the provisions of the statute, the son is entitled to no share of the estate of which the father died seized, or to so much only as shall make his share equal with the shares of his sisters. As the evidence now stands, the portion already received is of far greater value than that of either of the sisters can be. Still the defendant is entitled to have that fact formally examined and reported upon by a master, if he so desire.
But it is contended that the evidence offered in support of the complainant’s claim is illegal, and should be excluded.
1. It is objected that, inasmuch as the deed purports to bo a sale for a valuable consideration, it is not competent to contradict the deed by proof that it was made for natural love and affection or other good consideration. The evidence is not offered to invalidate the deed by showing a want of consideration. The title of the defendant is not called in question. The only design of the evidence is to *248 show the intent with which the deed was executed, and to prevent the defendant from using it for a fraudulent purpose to the prejudice of the other heirs of the grantor. The clause in a deed acknowledging payment of the consideration is merely prima facie evidence, and according to the current of American cases, and to the well settled doctrine in this state, may he explained, varied, or rebutted by parol proof. Clapp v. Tirrell, 20 Pick. 247; McCrea v. Purmort, 16 Wend. 460.
The case of Meeker v. Meekerr, 16 Conn. 383, is an authority directly in point. The advancement in that case was by a warranty deed from the father to the son for the consideration (expressed) of $2000. The objection now raised was urged and overruled, the court holding, upon parol proof of the real nature of the transaction, that it was an advancement.
It was well suggested by counsel, upon the argument, that this objection, if valid, would render the statute inoperative. Eor'where an advancement of land is made by father to son, it is the usual, if not universal practice, to do it by deed of bargain and sale, and the consideration is inserted as evidence of the value of the advancement intended to be made. So much is this the case, that by statute in some of the states, the consideration expressed in the deed is conclusive proof of the value of the advancement made.
It is further urged that the declarations of the father are incompetent evidence to prove an advancement. Where the declarations of the father are made at the time of the transaction they are clearly admissible as a part of the res gestee. Nor do I perceive any legal objection to declarations subsequently made. The declarations of the grantor subsequent to the date of the conveyance, to show fraud, or otherwise to invalidate the title of the grantee, are clearly incompetent. But as before said, the design of the evidence is not to impeach the title of the grantee. It is not offered to prove that the deed is fraudulent or inoperative, but to show the purpose or intent with which the 'deed was made by the *249 ancestor to avoid injustice and effect an equality as between the co-heirs. Advancement is a question of intent, and may be shown by the declarations of the parent or the admissions of the child. 16 Conn. 383; 6 Wharton 373; 1 Watts & Serg. 393.
If there be no direct evidence of intent, it may be inferred from the amount and character of the gift. 1 Mad. Chan. 512; 6 Wharton m.
Under the statute of distributions, such evidence is constantly, and it would seem must necessarily be received. A charge of the money or chattel advanced by the father to the son, or a memorandum of the fact that the sum advanced was intended as a gift, is received as evidence of the fact. Sometimes a bond or note is taken; but that converts the intended advancement into a debt from the son, unless a memorandum is elsewhere made of its real character. So , far as this case is concerned, the decision of the question is of no moment. It is shown that the father was intemperate. His declarations are proved to have been to some extent contradictory, and while I regard the declarations clearly indicative of an intent to make an advancement or gift to his son, I should not have been willing, upon the strength of those declarations alone, to have sustained the bill. If the declarations of the grantor are struck out of the case, I deem the evidence sufficient to overcome the allegations of the answer and to sustain the bill. The intent of the provision of the statute of distributions respecting advancements is to equalize, as near as may be, the shares of all the children of the intestate. The design of the act is to do what a good and just parent ought to do for all his children. The same beneficent design which could have no place in the English law of primogeniture is introduced into our statute directing the descents of real estate. Nix. Dig. 195, § 1.
The express design of the act is to equalize, as far as may be, the shares of the heirs. It designates no mode in which the advancement shall be made. It prescribes no evidence as essential to establish it. It simply declares that if the *250 ancestor in his lifetime has given and advanced any part of his lands to any of his issue, such issue shall not be entitled to any part of his real estate descending to his heirs, or no more than sufficient to make his share equal to the shares of the other issue in equal degree. The statute does not interfere with the declared will or manifest purpose of the ancestor. It takes nothing away from the child that has been advanced, however superior his share may be to that of the other children.
- Evidence was offered by the defendant to show that one of the daughters had treated her father unkindly, and that the husband of the other had given him just cause of provocation. This may have been a very natural and strong inducement for the father to advance the son by the gift of a larger portion than can be received by either of his daughters; but it can afford no pretext on the part of the defendant for depriving his sisters of their just share of the inheritance^ much less for the court to permit such manifest injustice. The beneficent design of the statute, in securing to all the children an equal portion of the inheritance, is in accordance with the spirit and genius of our institutions. Equality is equity, and it is the duty of this court especially to see that its purpose shall not be frustrated, except upon the most satisfactory grounds and upon the clearest evidence.
Where the deed upon its face is expressed to be for natural love and affection, the presumption is that it was designed • as an advancement. Where it is made for an alleged valuable consideration, that presumption must be overcome. But where the defendant’s answer admits that the consideration was not what it purports to be, and sets up another and a different consideration, it becomes him to prove by satisfactory evidence the case upon which he relies.
The fact alleged by the defendant, in his answer, that the personal estate of John R. Speer (the intestate from whom the land descended) is insufficient to pay his debts, does not make the administrators of the estate necessary or proper parties to the bill for partition. The intestate died over *251 three years before the filing of the bill. The real estate of a person dying seized thereof remains liable for the payment of his debts for one year after his death. After that period the land may be aliened without the encumbrance of the debt. Nix. Dig. 766, § 26.
. Neither the administrators nor the creditors of the intestate have any such interest in the land as renders them necessary parties. The defendant, who raises the objection, is himself one of the administrators. He admits that the estate is still unsettled. If there was a deficiency of assets, it was his duty long since to have applied to the Orphans Court for the sale of a part of the land sufficient to pay the debts. No such application appears to have been made. He ought not to be permitted to make his own neglect of duty an obstacle in the way of a partition.
But the decisive answer to the objection is, that a partition will not affect any rights, legal or equitable, which the creditor may have. If the land is liable for debts before the partition, it will remain so afterwards. Mortgagees are not necessary parties to a bill for partition, nor are their rights affected by it. Wotten v. Copeland, 7 Johns. Ch. R. 140.
Should the lands be found incapable of partition, and a decree for sale become necessary, it may then become a question how the rights of creditors should be protected. In Matthews v. Matthews, 1 Edwards 566, where the bill for partition was filed about twenty days after the death of the intestate, the court, under the provisions of the New York statute, regarding the sale as premature while the personal estate appeared to be insufficient for the payment of debts, declined to make an order for sale.
In Latimer v. Hanson, 1 Bland 51, after a decree for sale, and an actual sale made under a bill for partition, a creditor was permitted to come in by petition, and to have her debt paid out of the proceeds of the sale in the hands of the trustee. The court are inclined, on bills for partition, to protect the interest of all parties having legal or equitable claims upon the lands; but in whatever mode such object *252 may be accomplished, it' is certainly not proper in a case like the present that it should be done by making • the administrators parties. It will involve, indirectly, the investigation and settlement of the administrator’s accounts, and tend to delay and embarrassment in the conduct of the suit, besides withdrawing the settlement of the accounts from the appropriate tribunal.