I cannot agree with the opinion of the court.
The respondent Helen sought partition of real estate situate in this state of which her father, a widower, died seized, intestate, leaving seven other children. One of the defendants, by counter-claim, sought to charge her share by reason of certain transactions to be hereafter related.
The contention is that the respondent Helen procured apparent title to certain properties in her name by forged *Page 170 
instruments purporting to be made by her mother, but in fact made by her after her mother's death. Further, that she obtained large sums of money and the conveyance of certain properties from her father by undue influence and used the money for the purchase of other properties specified, and that she still holds title to the properties so acquired and purchased.
The purpose of the counter-claim was to cause a trust to be imposed in favor of all the children and accounting by respondent for her misdeeds.
The learned Vice-Chancellor found against such claims, but we think erroneously.
As to the forged instrument her brother Murray testified that she antedated the forged deeds, which purported to be from her mother to her, as of December 10th, 1935, forged the signature after her mother's death and he took acknowledgments of them as notary. One deed conveying Bradley Beach property he recorded. The deeds to the Newark properties she recorded. The recordings were not for some weeks after the date of the instruments. He is quite graphic in his testimony as to the way in which the forgery was made by tracing the mother's signature from a deed dated December 7th, 1935, which was prepared by Mr. Appel, a lawyer, and this deed does show that the signature had been tampered with.
There would probably be no trouble in establishing whether or not the instruments were forged, if they were available, but they were not produced, though the person who had possession of them is the alleged forger; and although she said that she gave them to lawyer Appel, when he was preparing certain other deeds, this is denied by him, and the receipt which she claims he gave her for the deeds was clearly shown to be for other deeds. The lawyers, who were familiar with her mother's signature, never saw the alleged forged deeds. At the hearing, certified copies were produced which, of course, show nothing as to genuineness or forgery of the signatures. When Helen sought to have a confirmatory deed drawn, in order that the heirs might confirm the same to her, she caused the description to be short and the scrivener, *Page 171 
who was familiar with her mother's signature, was not furnished with the deeds.
Respondent's mother had on deposit at the time of her death more than $7,000 in the Fidelity Union Trust Company. Thereafter, the daughter procured a transfer of this money to an account which she had that date opened in her own name in that company. The Trust Company afterward charged this money back, but by some means not explained, the father, the sole legatee of her mother's estate, transferred the money to her, together with other moneys which he had accumulated, making in all about $14,000, which together with income received from these properties, she used to purchase other properties at length described in the counter-claim.
It is apparent that the transfer of real estate and money originated in a purpose to defraud the State of New Jersey. Mrs. Jayson left all of her property, consisting of the three parcels of real estate covered by the alleged forged instrument and the cash in bank, to her husband. The husband and the children, apparently for tax evasion purposes, told the story that their mother's bank account was built up in trust for the daughter Helen by contributions from various members of the family. This was not so, because the account built up for her during her minority was duly transferred when she became of age. It was a distinct and different account from her mother's account which became her father's property and which she subsequently procured because of her influence over him.
The only person who could have disproved the evidence of forgery was the alleged forger and the proofs show that she studiously kept that evidence from the lawyers whom she employed to make other conveyances. For instance, when she was reconveying the Bradley Beach property to her father she, in part, prepared the conveyance putting in the description. Then she took it to her lawyer and he filled in the missing links, which she, as a lay person, did not know how to draw. It is noticeable that in preparing the forged deeds affecting the Newark property, the instruments recite that the previous conveyances were recorded in the office of the *Page 172 
"Clerk" of the County of Essex. No capable Newark lawyer would have so stated, because Essex County has had since 1859 (P.L.1859 p. 174) a registrar of deeds. The respondent evidently copied a Monmouth County deed made to her from which she traced her mother's signature, since that deed was recorded in the Monmouth County "clerk's office." The testimony as to the forgery is to be believed, since it finds support in the proofs throughout the entire case.
The zeal with which the respondent went after her mother's bank account demonstrates her cupidity. As before noted, on the day after her mother's death she transferred, by some means, the money in her mother's account to her own. This was later charged back. She must have had the paper effecting the transfer. If she had not been fearful she would not have concealed the instrument, and the deeds from the court and all who could have exonerated her if she were guiltless. Further than that, her conscience was not clear because, within two months of the recording of the forged deeds of gift, she was seeking a deed of confirmation from her brothers and sisters. If she had possessed a good conveyance she needed to have nothing more done. She evidently desired to bolster her position in the event of trouble.
The family probably went along with her plans, in order to build a case against the state's claim for an inheritance tax, probably in the hope that when the state was defeated and the properties were available the respondent would bring the salvaged property in for a division among all.
When Mrs. Jayson, and her husband, conveyed a property on December 7th, 1935, to respondent they employed Mr. Appel to prepare the instrument. If on December 10th of the same year, three days later, they were conveying to her three other properties, it seems strange that they should have the instruments prepared by an amateur and have them acknowledged before their son Murray, who was said to be a man of poor repute. The question recurs, if these deeds did not bear the earmarks of forgery why were they so promptly concealed? If the daughter was so anxious to secure her mother's bank account that she went after it by an instrument that was later dishonored by the Fidelity Union Trust Company, *Page 173 
there is good reason to conclude that she would by the same means have tried to secure the real estate, and her subsequent concealment of the instruments from those who would have detected the invalidity of the signature is eloquent proof that she did not dare to show them.
So much for the properties secured by the forged instruments. The complainant should take nothing thereby. She could not and did not offer an expert to prove the genuineness of the signature because she did not produce the instruments themselves, if she possessed them, and if she had destroyed them her guilt would be beyond denial.
The circumstances surrounding the later transfer by her father of the moneys left by her mother in the Fidelity Union Trust Company would indicate a definite purpose to defraud the State of New Jersey. Nothing should she take thereby, and a trust should be imposed to bring in to the father's estate the properties so acquired by forgery, as well as those secured with the money obtained in the manner established by the proofs in this case. As to the properties acquired by conveyance from her father and those purchased with moneys obtained in a like manner, a trust should also be imposed.
Jacob Jayson was injured in an automobile accident in 1931 and sustained a fractured skull. His accident affected his hearing and memory. After the death of his wife, he became an old and infirm man completely under the domination of his avaricious daughter. His hands trembled; he could get about only with difficulty. She had access to all his papers and documents, even his safe deposit box. She tried to induce him to make a will in her favor at a time when he could not comprehend what he was doing. When he transacted any business the respondent was always present. She had forced other members of the family out of the house so that her domination would be complete. She read his letters, prepared the answers and in every way guided his every action.
Appellants contend that the Bradley Beach conveyance was an advancement by Jacob Jayson to his daughter and the value thereof should be deducted from her share of his estate in the event of partition. *Page 174 
The law pertaining to advancements of real estate and construing a similar provision to N.J.S.A. 3:3-3 is to be found in Vice-Chancellor Bergen's opinion in Schlicher v. Keeler, affirmed, 73 N.J. Eq. 738. He said: "A conveyance of land in consideration of natural love and affection, for a nominal consideration, by a parent to a child, has been held to be an advancement, within our state, unless a contrary intention is made to appear, and the presumption arising from such condition is overcome. Speer v. Speer, 14 N.J. Eq. 240; Hattersley v.Bisset, 51 N.J. Eq. 597-601; 29 Atl. Rep. 187; 40 A.M. St. Rep.532." See, also, N.J.S.A. 3:3-3.
This presumption was not overcome and the appellants were entitled to take proofs as to value.
As to the two Newark properties conveyed by Flora Jayson to her daughter, the only consideration to support them is the recital of the natural love and affection of the parent. The proofs, however, that these properties were held in trust for Jacob Jayson are not so satisfying as to justify the conclusion that the advancement was made by him and the value thereof should be deducted from respondent's share of his estate.
Suffice it to say that the respondent was proved, by overwhelming evidence, to have been an avaricious, self-seeking woman who had no source of income save on the hypothesis that her brothers and sisters had created the nucleus of her fortune by gifts over a long period of years. This, however, was but a comparatively small amount of money — perhaps a little more than $5,000. Using her position of dominance, she obtained moneys from her father which she used to purchase properties. She obtained conveyances of other properties from him. During the period from her mother's death till her father's death she used every opportunity to acquire his property to his impoverishment and that of his heirs. To prevent profit from such unlawful conduct a trust arises in equity.
The case should have been remanded to the Court of Chancery for such accounting as might be necessary.
Mr. Justices Parker, Heher, Perskie and Colie join me in this dissent. *Page 175 
 For affirmance — CASE, DONGES, PORTER, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, JJ. 8.
For reversal — PARKER, BODINE, HEHER, PERSKIE, COLIE, JJ. 5.
 For modification — THE CHIEF-JUSTICE. 1. *Page 176